UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: THE GOODYEAR TIRE AND RUBBER COMPANY DERIVATIVE LITIGATION | ) ) Case No.  5:03CV02180 ) ) ) ) JUDGE JOHN R. ADAMS ) MAGISTRATE JUDGE GALLAS ) ) |

**VERIFIED CONSOLIDATED COMPLAINT**

Plaintiffs, by their attorneys, submit this Verified Consolidated Derivative Complaint (the "Consolidated Complaint") against the defendants named herein.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought by shareholders of Goodyear Tire & Rubber Company ("Goodyear" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between October 1998 and the present (the "Relevant Period") and that have caused substantial losses to Goodyear and other damages, such as to its reputation and goodwill.

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that plaintiffs' claims arise in part under the Constitution and laws of the United States, including the Sarbanes-Oxley Act of 2002. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). Additionally, this Court has jurisdiction over this action pursuant to 28 U.S.C.

§1332(a)(l) in that plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

3.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

4.     Venue is proper in the District because nominal defendant Goodyear is headquartered in this District and thus a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## SUMMARY OF THE ACTION

5.     On October 22, 2003, Goodyear announced that its 1998-2002 results would be restated to eliminate revenue that had been improperly recorded as revenues:

> Goodyear Tire & Rubber Co. said it will restate earnings for the past five years, decreasing net income by as much as $100 million over the period because of errors in intercompany billing systems and the implementation of a computerized accounting system.
>
> In an announcement after the close of trading, Goodyear postponed the release of its third-quarter results scheduled for Thursday until the middle of next month. However, the company said it expects to report a loss for the quarter in the range of $90 million to $115 million, or 51 cents to 66 cents a share.
>
> The huge restatement is only the latest problem to befall the Akron, Ohio, tire maker. Goodyear earlier this year narrowly averted a liquidity crisis by restructuring its $5 billion debt and negotiating a new line of credit. The company has struggled to cut costs and recently won concessions from its union to shed workers and close some factory capacity.

2

6.      Goodyear said it detected the errors while reviewing "various accounts, including ERP-impacted balance-sheet accounts." ERP is the computerized accounting system adopted by the Company in 1999. The Company said those accounts were principally in its North American tire and Engineered Products businesses. The decision to restate the earlier period results was made by Goodyear's management with the approval of the Audit Committee of the Company's Board of Directors (the "Board") and its independent auditors, PricewaterhouseCoopers, LLP.

7.      On May 19, 2004, Goodyear announced yet another restatement of financial results for the years through 2002 as well as the first nine months of 2003 which totaled *$164.8 million*, in addition to the $84.7 million of adjustments previously disclosed in the third quarter of 2003 and the $31.3 million in adjustments recorded in the second quarter of 2003.

8.      Plaintiff Plumbers and Pipefitters Local 572 Pension Fund is, and was at times relevant hereto, an owner and holder of Goodyear common stock. Plaintiff is a citizen of Tennessee.

9.      Plaintiff Vivian Golumbeski is, and was at times relevant hereto, an owner and holder of Goodyear common stock. Plaintiff is a citizen of Arizona.

10.     Plaintiff James Wargo is, and was at times relevant hereto, an owner and holder of Goodyear common stock. Plaintiff is a citizen of Pennsylvania.

11.     Nominal defendant Goodyear is a corporation organized and existing under the laws of the State of Ohio with its headquarters located at 1144 East Market Street, Akron, Ohio. Goodyear manufactures tires and rubber products. It operates in segments, including North American Tire, European Union Tire, Eastern Europe, Africa and Middle East Tire, Latin American Tire, Asia Tire, Engineered Products (which develops, manufactures, distributes and sells rubber and thermoplastic products worldwide), and Chemical Products (which develops,

3

manufactures, distributes and sells synthetic rubber and rubber lattices). The Company has 175.3 million shares of its public stock traded on the New York Stock Exchange.

12.     Defendant Samir G. Gibara ("Gibara") was, at all times relevant hereto, President until January 2000, Chairman of the Board of Goodyear until June 30, 2003. Gibara was Chief Executive Officer ("CEO") of Goodyear until December 31, 2002. Also, Gibara and Goodyear entered into an agreement on February 4, 2003, which provided for the retention of Gibara as a consultant to Goodyear from January 1, 2003, through December 31, 2003.   Under the agreement, Gibara provided assistance and advice to Goodyear and received $180,000 paid in equal monthly installments.  These payments were in addition to any fees Gibara received as a non-employee director.   Because of Gibara's positions, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Gibara participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. For FY:02, FY:0l, FY:00 and FY:99, Goodyear paid defendant Gibara $1,703,582, $2,225,151, $1,325,227 and $1,634,270, respectively, in salary, bonus and other compensation, and granted him 200,000, 170,000 and 250,000 options to purchase Goodyear stock, respectively from FY:01-FY:99. During the Relevant Period, Gibara sold 7,200 shares of Goodyear stock for proceeds of $449,382. Gibara is a citizen of Ohio.

4

13.     Defendant Robert J. Keegan ("Keegan") is, and was, at times relevant hereto, President, Chief Operating Officer and a director of Goodyear since October 3, 2000, and President and CEO since January 1, 2003.  Keegan became Chairman of the Board on July 1, 2003. Because of Keegan's positions, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Keegan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, FY:02, FY:01 and FY:00, Goodyear paid defendant Keegan $1,517,456, $853,350, $1,480,177 and $1,500,500, respectively, in salary, bonus and other compensation, and granted him 200,000, 40,000, 90,000 and 330,000 options to purchase Goodyear stock, respectively. Keegan is a citizen of Ohio.

14.     Defendant Robert W. Tieken ("Tieken") was, at times relevant hereto, Chief Financial Officer ("CFO") and Executive Vice President of Goodyear until his retirement o May 31, 2004. Because of Tieken's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Tieken participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, FY:02, FY:0l, FY:00 and

FY:99 Goodyear paid defendant Tieken $557,256, $562,639, $759,039, $525,238 and $563,113 respectively, in salary, bonus and other compensation, and granted him 45,000, 40,000, 40,000, 35,000 and 45,000 options to purchase Goodyear stock, respectively. Tieken is a citizen of Ohio.

15.    Defendant Steven A. Minter ("Minter") is, and at all times relevant hereto was, a director of Goodyear. Because of Minter's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Minter participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Minter is a citizen of Ohio.

16.    Defendant Agnar Pytte ("Pytte") was, at all times relevant hereto, a director of Goodyear until his retirement in May 2004. Because of Pytte's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Pytte participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Pytte is a citizen of Ohio.

17.    Defendant John G. Breen ("Breen") is, and at all times relevant hereto was, a director of Goodyear. Because of Breen's position, he knew the adverse non-public information

about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Breen participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Breen is a citizen of Florida.

18.     Defendant William J. Hudson, Jr. ("Hudson") is, and at all times relevant hereto was, a director of Goodyear. Because of Hudson's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Hudson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Hudson is a citizen of Pennsylvania.

19.     Defendant James C. Boland ("Boland") is, and at times relevant hereto was, a director of Goodyear and has been since December 2002. Because of Boland's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Boland participated in the issuance of false

and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Boland is a citizen of Ohio.

20. Defendant James M. Zimmerman ("Zimmerman") is, and at times relevant hereto was, a director of Goodyear and has been since June 2001. Because of Zimmerman's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Zimmerman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Zimmerman is a citizen of Ohio.

21. Defendant Gary D. Forsee ("Forsee") is, and at times relevant hereto was, a director of Goodyear and has been since August 2002. Because of Forsee's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Forsee participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Forsee is a citizen of Georgia.

22. Defendant Susan E. Arnold ("Arnold") is, and at times relevant hereto was, a director of Goodyear and has been since January 2003. Because of Arnold's position, she knew the adverse non-public information about the business of Goodyear, as well as its finances,

8

markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Arnold participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Arnold is a citizen of Ohio.

23.     Defendant Martin D. Walker ("Walker") was, at all times relevant hereto was, a director of Goodyear until May 2003. Because of Walker's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Walker participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Walker is a citizen of California.

24.     Defendant Kathryn D. Wriston ("Wriston") was, at times relevant hereto, a director of Goodyear until May 2003. Because of Wriston's position, she knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Wriston participated in the issuance of false and/or

misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Wriston is a citizen of New York.

25.     Defendant Edward T. Fogarty ("Fogarty") was, at times relevant hereto, a director of Goodyear until May 2003. Because of Fogarty's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith, During the Relevant Period, Fogarty participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Fogarty is a citizen of Connecticut.

26.     Defendant Katherine G. Farley ("Farley") was, at all times relevant hereto, a director of Goodyear until June 2001. Because of Farley's position, she knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Farley participated in the issuance of false and or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Farley is a citizen of New York.

27.     Defendant George H. Schofield ("Schofield") was, at all times relevant hereto, a director of Goodyear until April 2001. Because of Schofield's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present

and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Schofield participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Schofield is a citizen of Massachusetts.

28.    Defendant William C. Turner ("Turner") was, at all times relevant hereto, a director of Goodyear until April 2001. Because of Turner's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and fixture business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Turner participated in the issuance of false and/or misleading statements, including the preparation of the false and/on misleading press releases and SEC filings. Turner is a citizen of Arizona.

29.    Defendant Philip A. Laskawy ("Laskawy") was, at times relevant hereto, a director of Goodyear until December 2002. Because of Laskawy's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Laskawy participated in the issuance of false and/or

11

misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Laskawy is a citizen of Connecticut.

30.     Defendant William E. Butler ("Butler") was, at all times relevant hereto, a director of Goodyear until April 2002. Because of Butler's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Butler participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Butler is a citizen of Ohio.

31.     Defendant Thomas H. Cruikshank ("Cruikshank") was, at all times relevant hereto, a director of Goodyear until April 2002. Because of Cruikshank's position, he knew the adverse non-public information about the business of Goodyear, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Cruikshank participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Cruikshank is a citizen of California.

32.     The defendants identified in ¶¶11-12, 15-31 are referred to herein as the "Director Defendants." The defendants identified in ¶¶12-14 are referred to herein as the "Officer Defendants." The defendant identified in ¶12 is referred to herein as the "Insider Selling

Defendant." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendant are referred to herein as the "Individua

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers, directors, and/or fiduciaries of Goodyear and because of their ability to control the business and corporate affairs of Goodyear, the Individual Defendants owed Goodyear and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Goodyear in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Goodyear and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

34.     Each director and officer of the Company owed to Goodyear and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

35.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Goodyear, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Goodyear, each of the Individual Defendants had access to adverse

13

non-public information about the financial condition, operations, and improper representations of Goodyear.

36.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Goodyear, and was at all times acting within the course and scope of such agency.

37.    To discharge their duties, the officers and directors of Goodyear were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Goodyear were required to, among other things:

> (a)    refrain from acting upon material inside corporate information to benefit themselves;
>
> (b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;
>
> (c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the stock;
>
> (d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of

14

financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Goodyear conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent mariner in compliance with all applicable federal, state and local laws, rules and regulations.

38.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Goodyear, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Goodyear's Board during the Relevant Period.

39.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial

15

results and prospects, as detailed herein *infra,* and by failing to prevent the Individual Defendants

from taking such illegal actions. In addition, as a result of defendants' illegal actions and course

of conduct during the Relevant Period, the Company is now the subject of several class action

law suits that allege violations of federal securities laws. As a result, Goodyear has expended and

will continue to expend significant sums of money. Such expenditures include, but are not

limited to:

> (a)  Costs incurred in reviewing and restating the Company's financials and debt
>      load;
>
> (b)  Costs incurred to carry out internal investigations, including legal fees paid to
>      outside counsel and financial consultants; and
>
> (c)  Costs incurred in investigating and defending Goodyear and certain officers in
>      the class actions, plus potentially millions of dollars in settlements or to
>      satisfy an adverse judgment.

40.   Moreover, these actions have irreparably damaged Goodyear's corporate image

and goodwill. For at least the foreseeable future, Goodyear will suffer from what is known as the

"liar's discount," a term applied to the stocks of companies who have been implicated in illegal

behavior and have misled the investing public, such that Goodyear's ability to raise equity capital

or debt on favorable terms in the future is now impaired.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.   In committing the wrongful acts alleged herein, the Individual Defendants have

pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their common plan or design. In addition to the

wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants

further aided and abetted and/or assisted each other in breach of their respective duties.

42.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual De executive and directorial positions at Goodyear and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Goodyear, regarding the Individual Defendants' management of Goodyear's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

43.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least October 1998 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that Goodyear was misrepresenting its financial results. In addition, defendants also made other specific, false statements about Goodyear's financial performance and future business prospects, as alleged herein.

44.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business

17

prospects; and to artificially inflate the price of Goodyear common stock so that: (i) the Insider Selling Defendant could dispose of $449,382 of his personally held stock; and (ii) each of the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

45.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposely, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

46.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IMPROPER STATEMENTS

47.     On October 3, 1998, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Announces Earnings Improvement." The press release stated in part:

> The Goodyear Tire & Rubber Company reported today that its third-quarter income from continuing operations was $185 million or $1.17 per share compared with $184.8 million or $1.16 per share in the year-ago period.

18

The earnings improvement resulted despite economic downturns in Asia and Latin America. Unit sales in the mature markets of North America and Europe increased 6.1 percent over last year's third period. Weak original equipment sales, principally in Latin America and Asia, held the overall improvement to 2.5 percent over the third quarter of 1997.

48.    On February 3, 1999, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Tops '97 Net Income by 22 Percent."  The press release stated in part:

The Goodyear Tire & Rubber Company today reported fourth quarter net income of $121.5 million or 78 cents per share, versus $2 million or 1 cent per share in the year-ago period. Net income for 1998 was $682.3 million or $4.31 per share, up 22 percent over 1997 net income of $558.7 million or $3.53 per share. All per-share amounts are diluted.

Goodyear's 1998 fourth quarter worldwide sales were $3.2 billion compared to $3.3 billion in 1997. Worldwide tire unit sales were up 1.8 percent over the 1997 fourth quarter. North American tire units increased 2.6 percent, and international units increased .9 percent, reflecting strong replacement market sales.

49.    On April 21, 1999, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Reports First Quarter Results, Announces Rationalizations; Net income before rationalizations charges is 90 cents per share; $150 million in annual savings anticipated from rationalizations." The press release stated in part:

The Goodyear Tire & Rubber Company today reported net income before rationalization charges of $141.5 million (90 cents per share) for the first quarter of 1999. This compares to $173.6 million ($1.09 per share) in the 1998 quarter. All per-share amounts are diluted.

During the 1999 quarter, Goodyear curtailed production to better align its inventories and continued to confront weak economic conditions in emerging markets around the world.

Worldwide, first quarter sales were $3 billion in 1999, versus $3.1 billion in 1998. The strengthening of the U.S. dollar versus international currencies amounted to an estimated $100 million, accounting for the decline in revenues.

50.     On July 21, 1999, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Reports Results for Second Quarter, First Half; Second quarter net income is 41 cents per share; Inventories reduced $145 million during first half; North American tire unit sales increase 749%

> The Goodyear Tire & Rubber Company today reported net income 91 $65.7 million (41 cents per share) for the second quarter of 1999. This compares with $199 million ($1.25 per share) achieved in the second quarter of 1998. The 1999 income is within the range announced on June 24. All per-share amounts are diluted.
>
> Second quarter earnings reflect the impact of weak emerging market economies in the company's European, Latin American and Engineered Products business units. Lower levels of capacity utilization attributable to inventory reduction and manufacturing rationalization programs also impacted earnings negatively.

51.     On October 21, 1999, the Individual Defendants caused the Company to issue a press release entitled "Goodyear reports results for third quarter, nine months; Third Quarter Net Income is 61 Cents Per Share; Global Tire Unit Sales Increase 8.1% In Third Quarter; Dunlop Tire Integration Process Begins." The press release stated in part:

> The Goodyear Tire & Rubber Company today reported net income of $97.2 million (61 cents per share) for the third quarter of 1999. This compares with $185 million ($1.17 per share) achieved in the third quarter of 1998. All per-share amounts are diluted.
>
> The results include $142.9 million of after-tn gains on the sale of assets, net rationalization charges of $15.7 million after tax and operating charges, primarily inventory write-offs, of $100.4 million after tax.
>
> Third quarter earnings reflect under-performance in the companies North American Tire business, including an inability to address stronger-than-anticipated demand in North America; the impact of integrating the Dunlop tire businesses in North America and Europe; and. on-going weak economic conditions in Latin America.

52.     On February 9, 2000, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Reports Results for Fourth Quarter, 1999; Global tire unit sales

up 13.2% in fourth quarter; Fourth quarter income before rationalizations is 30 cents per share; significant improvement seen for 2000." The press release stated in part:

> The Goodyear The & Rubber Company today reported net income of $40.8 million (26 cents per share) for the fourth quarter of 1999. This compares with $121.5 million (78 cents per share) achieved in the fourth quarter of 1998. All per share amounts are diluted.
>
> Fourth quarter 1999 results include $7.7 million ($6.8 million after tax, 4 cents per share) in net rationalization charges. Excluding the impact of restructuring, fourth quarter 1999 income was $47.6 million (30 cents per share).
>
> The 1998 fourth quarter included gains from the sale of assets of $6.5 million after tax (4 cents per share). Before these gains, fourth quarter 1998 income was $115 million (74 cents per share).

53.    On April 12, 2000, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Reports Results for 2000's First Quarter; Sales Increase 18%; Net Income Exceeds Expectations." The press release stated in part:

> The Goodyear Tire & Rubber Company today reported net income of $63.6 million (40 cents per share) for the first quarter of 2000, reflecting improved performance in North American Tire, Latin America Tire and the global Engineered Products business units. All per-share amounts are diluted.
>
> "First quarter earnings reflect the benefits of 20 percent unit volume growth, Dunlop joint venture synergies and global manufacturing rationalization as shown in the turnaround performance of the company's North America, Latin Samir G. Gibara, chairman, chief executive officer and president. First quarter earnings exceeded the First Call consensus of 35 cents per share.

54.    On July 24, 2000, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Reports Results for Second Quarter, First Half Earnings before rationalizations are 41 cents per share, up 11% from 1999; Global tire unit volume up 20%; Global sales up 14%." The press release stated in part:

> The Goodyear Tire & Rubber Company today reported net income of $59.7 Million (38 cents per share) for the second quarter of 2000. This compares with $65.7 million (41 cents per share) in the second quarter of 1999.

Earnings before net rationalization charges were 41 cents per share ($64.9 million) for the second quarter of 2000. Earnings before rationalization charge reversals were 37 cents per share *($59.7* million) for thç 1999 quarter. All per-share amounts are diluted.

"Second quarter 2000 earnings reflect the positive impact of the Dunlop fire operations, cost containment initiatives and improved manufacturing efficiency, offset by higher raw material costs and increasingly competitive market conditions around the world," said Samir G. Gibara, chairman, chief executive officer and president. "These results were further impacted by currency movements, particularly in continental Europe and the United Kingdom."

55.     On October 24, 2000, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Reports Results for Third Quarter, Nine Months; Global Tire Unit Volume Up 8.7% In Third Quarter; High Raw Material, Energy Costs Impact Results; Goodyear Consumer Tire Growth Outpaces Industry in North America." The press release stated in part:

The Goodyear Tire & Rubber Company today reported a net loss of $6.6 million (4 cents per share) for the third quarter of 2000. Net income in the third quarter of 1999 was $109.1 million (69 cents per share).

The 2000 results include after-tax rationalization charges of $1.2 million (1 cent per share) related to closing a manufacturing facility in Italy and a gain of $3.2 million (2 cents per share) resulting from a property sale in Mexico. Last year's results include various adjustments, most notably an after-tax gain of $143.7 million (90 cents per share) resulting from the completion of the company's Dunlop joint ventures in September 1999. All per share amounts are diluted.

56.     On February 14, 2001, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Reports Record Sales for 2000; Global tire volume up 11.4% for year; Global rationalization, cost-cutting initiatives announced; Fourth quarter loss from operations is 11 cents per share." The press release stated in part:

The Goodyear Tire & Rubber Company today reported its 2000 annual sales were a record $14.4 billion and announced plans to improve its profitability during 2001.

22

achieved in North America; Loss from operations is $3.5 million, 2 cents per share." The press

release stated in part:

> Despite a significant reduction in orders from North American vehicle
> manufacturers and an abrupt slowdown in the region's replacement tire market,
> The Goodyear Tire & Rubber Company today reported results for the first quarter
> of 2001 that reflect improved operating performance over the previous quarter.
>
> Excluding after-tax rationalization charges of $57.1 million and an after-
> tax gain of $13.9 million resulting from the sale of land and buildings in the
> United Kingdom, Goodyear posted an after-tax loss from operations of $3.5
> million (2 cents per share) in 2001's first quarter. The company estimates the
> economic impact of foreign currency movements reduced the quarter's operating
> income by about $20 million.

58.     On July 23, 2001, the Individual Defendants caused the Company to issue a press

release entitled "Goodyear Reports Results for 2001's Second Quarter; Net income of $7.8

million, 5 cents per share; Continued market share gains in North America." The press release

stated in part:

> The Goodyear Tire & Rubber Company today reported net income of $7.8 million
> (5 cents per share) for the second quarter of 2001. This compares with net income
> of $77.1 million (49 cents per share) in the second quarter of 2000 and a net loss
> of $46.7 million (30 cents per share) for the first quarter of 2001. Al.l per-share
> amounts are diluted.

During the 2000 second quarter, the company recorded net after-tax rationalization charges of $5.2 million. No rationalization charges were recorded in the second quarter of 2001.

"The ongoing slowdown in the auto and commercial truck industries around the globe have led to a significant reduction in orders and a corresponding effort to adjust production and inventory levels in our tire, engineered products and chemicals businesses. More production curtailments will be needed in the third quarter until demand improves," said Saniir G. Gibara, chairman and chief executive officer.

59.    On October 25, 2001, the Individual Defendants caused the Company to issue a

press release entitled "Goodyear reports results for 2001's third quarter; Net income of $9.3

million, 6 cents per share; Sales, units and market share gains in North America." The press

release stated in part:

The Goodyear Tire & Rubber Company today reported net income of $9.3 million (6 cents per share) for the third quarter of 2001. Net income in the third quarter of 2000 was $17 million (11 cents per share), which included a net after-tax gain of $2 million (1 cent per share). All per share amounts are diluted.

The company estimates that the negative effect of currency movements reduced operating income by approximately $20 million in 2001's third quarter.

Third quarter results reflect continued weak economic conditions and market deterioration in much of the world and an abrupt decline in sales in September.

60.    On February 8, 2002, the Individual Defendants caused the Company to issue a

press release entitled "Goodyear reports results for 2001's fourth quarter; Net loss is $1.07 per

share for fourth quarter; 2001 positive cash flow of$724 million; Global rationalization

initiatives to eliminate high-cost tire capacity." The press release stated in part:

The Goodyear Tire & Rubber Company today reported a net loss of $174.0 million ($1.07 per share) for the fourth quarter of 2001. This compares with a net loss of $102.0 million (65 cents per share) in the fourth quarter of 2000.

The fourth quarter 2001 results include afler-tax rationalization charges and other adjustments totaling $126.9 million (78 cents per share). Excluding these adjustments, Goodyear posted a loss of $47.1 million (29 cents per share)

24

for the period.

The after-tax adjustments recorded in the fourth quarter of 2001 include a gain of $16.9 million (10 cents per share) on the sale of its specialty chemicals business, rationalization charges of $ 101.2 million (62 cents per share) and a charge of $18.6 million (11 cents per share) against Cost of Goods Sold for a tire replacement program. Equity in Earnings of Affiliates includes a charge of $24.0 million (15 cents per share) for a rationalization program at the company's South Pacific Tyres joint venture in Australia.

61.    On April 24, 2002, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Reports Results for 2002's First Quarter." The press release stated in part:

First quarter 2002 results include a pre-tax charge of $10 million (4 cents per share) principally related to the return of inventory to Goodyear following the April 6, 2002, closure of Penske Automotive Centers in the United States.

The 2002 first quarter was also adversely affected by approximately $95 million in costs resulting from significant production cutbacks in the fourth quarter of 2001 due to inventory reduction programs and lower demand during that period.

62.    On July 23, 2002, the Individual Defendants caused the Company to issue a press release entitled "Goodyear reports results for 2002's second quarter; Net income more than triples to $28.9 million, 18 cents per share; Most profitable quarter in two years." The press release stated in part:

The Goodyear Tire & Rubber Company today reported net income of $28.9 million (18 cents per share) for the second quarter of 2002. Net income in the second quarter of 2001 was $7.8 million (5 cents per share). All per share amounts are diluted.

Worldwide, Goodyear's second quarter sales were $3.5 billion in 2002, versus $3.6 billion in 2001. Tire unit volume in 2002's second quarter was 53.3 million units, down 4 percent from last year.

"Our earnings more than tripled despite volatile and difficult economic and market conditions in much of the world," said Sam G. Gibara, chairman and chief executive officer. "Cost reduction programs and rationalization activities are paying off. We are also benefiting from lower raw material costs. While we still

face challenges, this was our best earnings performance since the second quarter of 2000," he said.

The Goodyear Tire & Rubber Company today reported a net loss of $63.2 million (39 cents per tare) for the first quarter of 2002. This compares with a net loss of $46.7 million (30 cents per share) in the first quarter of 2001.

63.    On October 30, 2002, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Reports Results for 2002's Third Quarter; Net income more than triples to $33.7 million, 20 cents per share; Earnings, margins improve in 6 of 7 businesses." The press release stated in part:

The Goodyear Tire & Rubber Company today reported net income of $33.7 million (20 cents per share) for the third quarter of 2002. Net income in the third quarter of 2001 was $9.3 million (6 cents per share). All per share amounts are diluted.

Worldwide, Goodyear's third quarter sales were $3.5 billion in 2002, versus $3.7 billion in 2001. Tire unit volume in 2002's third quarter was 54.4 million units, down 4 percent from last year.

The company estimates that the effects of currency movements negatively impacted worldwide sales by approximately $4 million and earnings by $10 million in the third quarter of 2002.

64.    On April 3, 2003, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Reports Results for 2002's Fourth Quarter; Net loss per share, including $6.17 non-cash charge, is $6.30 for the fourth quarter; International units show continuing improvement." The press release stated in part:

The Goodyear Tire & Rubber Company today reported a net loss of $1.1 billion ($6.30 per share) for the fourth quarter of 2002, compared with a net loss of $74.0 million ($1.07 per share) in the fourth quarter of 2001. All per share amounts are diluted.

The quarter's results reflect continuing improvement in the company's international tire business as well as its Engineered Products operation. Business conditions, and results, in North America remain weak.

"The turnaround in six of our seven businesses continued in the fourth quarter," said Robert J. Keegan, Goodyear president and chief executive officer. "All four of our international tire businesses achieved a higher profit margin compared to a year ago, with margins more than doubling in three of those businesses. Our 2002 results, especially in our North American Tire business, are extremely disappointing.

65. On April 30, 2003, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Reports Results for 2003's First Quarter; Sales increase 7.1 percent from first quarter 2002; Operating results and margins improve in six businesses." The press release stated in part:

The Goodyear Tire & Rubber Company today reported a net loss of $163.3 million (93 cents per share) for the first quarter of 2003, compared with a net loss of $63.2 million (39 cents per share) in the first quarter of 2002. All per share amounts are diluted.

Six of the company's seven businesses continued to perform well during the quarter, posting year-over-year improvement in segment operating income and profit margin. However, these results were not enough to fully offset a loss in the company's North American Tire business, charges related to rationalization activities and an increased tax burden.

First quarter total segment operating income was $68.0 million, more than double the $32.9 million achieved in the 2002 period. First quarter loss before income taxes was $135.0 million, compared to a loss of *$85.6* million in the prior-year period. See the note at the end of this release for further explanation and a reconciliation table.

66. On July 30, 2003, the Individual Defendants caused the Company to issue a press release entitled "Goodyear Reports Results for 2003's Second Quarter; Sales increase 8 percent from second quarter 2002; Segment operating income improves in six businesses." The press release stated in part:

The Goodyear Tire & Rubber Company today reported a net loss of $73.6 million (42 cents per share) for the second quarter of 2003, compared with net income of $28.9 million (18 cents per share) in the second quarter of 2002. All per share amounts are diluted.

27

The company reported second quarter sales of $3.8 billion for 2003, up 8 percent from $3.5 billion during the prior-year period. Tire unit volume in the second quarter of 2003 was *52.8* million units, compared to *53.3* million units in the 2002 period.

We are disappointed in our financial results for the second quarter, but we are encouraged by the numerous positive trends in our company and we are optimistic about our turnaround," said Robert S. Keegan, Goodyear chairman and chief executive officer.

67.     Ultimately, on October 22, 2003, Goodyear announced that its 1998-2002 results

would be restated to eliminate revenue that had been improperly recorded as revenues:

The Goodyear Tire & Rubber Company today announced that it will restate its financial results for the years 1998-2002 and for the first and second quarters of 2003 to record adjustments primarily resulting from the implementation of an enterprise resource planning accounting system (ERP) in 1999 and errors in inter-company billing systems. These adjustments, which are being identified and corrected by Goodyear, do not affect the company's net cash position, and the restatement will not affect its access to credit facilities,

Although the company is still reviewing the matter, the adjustments are currently expected to decrease net income over the restatement period by up to $100 million.... A reduction is anticipated in shareholders' equity as of June 30, 2003, of up to $120 million, of which $20 million relates to periods prior to 1998.

* * *

Goodyear detected the errors in the course of a review of various accounts, including ERP-impacted balance sheet accounts. These accounts were principally within the company's North American Tire and Engineered Products businesses. The restatement will also include adjustments for timing differences in other areas of the company's business.

The company's decision to restate prior-period financial statements was made by Goodyear management with the concurrence of its Audit Committee and its independent auditors, PricewaterhouseCoopers LLP.

Due to the timing of this restatement process, the company today is providing estimated results for the third quarter of 2003 rather than the detailed announcement, which had been scheduled for October 23. The investor conference call scheduled for that day has been cancelled. Goodyear intends to announce its full third quarter results and file the amended 2002 Annual Report on Form 10-K and 2003 first and second quarter reports on Form 10-Q by mid-

November.

Goodyear said it expects to report a net loss for the third quarter of 2003 in the range of $90 million to $115 million (51 cents to 66 cents per share).

* * *

The net loss will include net rationalization charges of approximately $56 million before tax (27 cents per share) related to a plant closing and employment reductions in North America and Europe. These programs will result in employment reductions totaling about 1,360 and approximate annualized cost savings of $65 million.

## IMPROPER FINANCIAL REPORTING DURING THE RELEVANT PERIOD

68.     On November 19, 2003, Goodyear provided details of its previously announced analysis of the restatement of financial results for the years 2002, 2001, 2000 and pre-2000, as well as the first six months of 2003. Additionally, the Company announced that the SEC had launched a formal investigation into the Company's accounting practices:

Goodyear said it has completed its analysis of prior-period financial restatements for the years 2002, 2001, 2000 and pre-2000, as well as the first six months of 2003. Details of these adjustments are included in the company's Form 8-K filed today with the U. S. Securities and Exchange Commission.

As a result of Goodyear's analysis, the company has recognized adjustments that reduced net income over these periods by ***$84.7 million*** through June 30, 2003. The impact on net income for the restated periods is: an increase of $10.4 million for the first six months of 2003; a decrease of $16.9 million in 2002; a decrease of $26.2 million in 2001 and an increase of $0.9 million in 2000. The impact on amounts related to years prior to 2000 was recorded as a $52.9 million reduction to shareholders' equity at Jan. 1, 2000. Changes to pre-2000 financial information also will be reflected in the company's amended 2002 Form 10-K/A as part of its five-year selected financial data.

The restatement principally arose from an intensified effort by the company to reconcile certain accounts. This analysis initially resulted in a provision to reduce net income by $31.3 million, which was reflected in the quarter ended June 30, 2003 Form 10-Q. During the third quarter of 2003, the company identified additional adjustments arising from the account reconciliations and was advised by its independent accountants, PricewaterhouseCoopers LLP, that these issues resulted in a ***material weakness in internal controls*** that required strengthening procedures for account

29

reconciliation, internal reporting and monitoring. Based on an assessment of the impact of the adjustments to the expected 2003 results, Goodyear decided to restate previously issued financial statements. The restatement also includes changes to the timing of certain previously recognized adjustments not arising from account reconciliations as well as other adjustments identified during the restatement process.

* * *

Goodyear said it continues to implement enhanced measures to strengthen its account reconciliation procedures. These include training and continued communications for associates regarding account reconciliation and additional management oversight of the process. Also, the company has enhanced its account reconciliation monitoring process, assigned individual responsibility for reconciling specific accounts and increased internal audit review of account reconciliations.

The company plans to upgrade the technical capabilities of associates within the finance function, add personnel where appropriate and expand the staffing, resources and responsibilities of the internal audit function. Further, Goodyear plans to strengthen reporting relationships within the finance function as well as review and identify areas in its accounting systems that can be simplified or automated.

The company remains fully dedicated to providing timely and accurate financial reporting, and will continue to evaluate the effectiveness of its controls and procedures on an ongoing basis.

**Goodyear also said the SEC advised the company that it had initiated an informal inquiry into the facts and circumstances related to the restatement.** The company is cooperating fully with the SEC and has provided requested information as expeditiously as possible. Because the informal SEC inquiry is currently ongoing, the outcome cannot be predicted at this time.

69.     On May 19, 2004, Goodyear provided details of additional restatements of

financial results for the years through 2002 as well as the first nine months of 2003, which nearly

doubled the restatement numbers from October, 2003:

Goodyear announced today *$164.8 million* in restatement adjustments in addition to the $84.7 million of adjustments previously disclosed in the third quarter of 2003 and the $31.3 million in adjustments recorded in the second quarter of 2003. These adjustments include approximately $65 million announced on April 12, 2004, as well as an additional adjustment of $100.1 million resulting

from the company's reassessment of the discount rate used in valuing its obligations in respect to domestic pension and other post-retirement benefit plans.

Details of these adjustments are included in the company's Form 10-K on file with the U.S. Securities and Exchange Commission.

As a result of these actions, financial results for the years 2001 and 2002, as well as quarterly information for 2002 and 2003, have been restated to reflect the accounting adjustments. The restatements also affect periods prior to 2001.

The total impact of the restatements, including the adjustments announced today, increased the net loss by approximately $56.2 million for 2003; by $121.2 million for 2002, including a tax valuation allowance of $81.2 million; and by $50.5 million for 2001. The impact on years prior to 2001 was recorded as a $52.9 million reduction to retained earnings at Jan. 1, 2000.

The $164.8 million of restatement adjustments announced today are comprised of the following:

**Accounting Irregularities**

An investigation into the company's overseas accounting resulted in a reduction of net income through 2003 of $10.7 million, primarily impacting the company's European Union business. The majority of the adjustments related to accrual accounts that were improperly adjusted between periods or expenses that were improperly deferred. These adjustments primarily related to accounts receivable, fixed assets, accounts payable and other long-term liabilities that were improperly adjusted.

Further, Goodyear recorded accounting adjustments that reduced net income by $17.7 million through 2003, resulting from improper understatement of the workers' compensation liability.

**Additional Accounting Adjustments**

The company also recorded adjustments that reduced net income by $36.3 million through 2003. These adjustments primarily related to account reconciliations of $18.4 million, adjustments to general and product liability reserves of $11.6 million and adjustments totaling $6.3 million identified through a stand-alone audit of the Chemical business segment.

**Discount Rate Reassessment**

During the first quarter of 2004, Goodyear reassessed the discount rate used in calculating costs of pensions and other post-retirement benefits over the last five-year period. The total reduction to income before tax was $18.9 million.

31

> The reassessment of the discount rate also resulted in an increase to the company's minimum pension liability of $160.9 million, which is recorded in Other Comprehensive Income (included in the equity section of the Balance Sheet) and a related $81.2 million increase in income tax expense in 2002 to provide for a valuation allowance against the tax benefit of this adjustment. These discount rate adjustments accounted for the increase in accounting adjustments over the estimate of $65 million announced on April 12, 2004. The reassessment of the discount rate did not significantly change the company's underfunded pension obligation at the end of 2003 and had no impact on required cash contributions.

70.     During a conference call which followed Goodyear's second financial restatement in seven months on May 19, 2004, CEO Keegan cited the Company's "noncompliance with company policy," and stated that the Company had taken numerous steps to rectify the situation, including: disciplining "numerous employees"; restructuring the chain of command so that the finance directors report directly to the chief financial officer; changing compensation structures for all finance directors; and "beefing up" staffing in the finance and internal audit functions. Keegan also stated that the Company was "cooperating fully" with the ongoing SEC investigation into Goodyear's questionable accounting practices.

71.     In order to inflate the price of Goodyear's stock and make its issuance of shares possible, the Individual Defendants caused the Company to falsely report its results for 1998-2002 through improper accounting practices. The Company subsequently restated these financial results.

72.     Goodyear has now admitted that it inappropriately recorded transactions included in its results, and has restated those results to remove some $180 million in improperly reported income, such that its 1998-2002 financial statements were not a fair presentation of Goodyear's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

73.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R, §210.4-0l(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

74.     In Goodyear's 2001 Form 10-K, it represented that it recognized revenue in accordance with GAAP.

75.     The fact that Goodyear is going to restate its financial statements for 1998-2002 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Goodyear was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB No, 20, 114.   In fact, under Statement of Accounting Standard No. 16, Prior Period Adjustments, restatements are only permitted -- and are required -- *for material accounting errors or irregularities that existed at the time the financial statements were prepared*. Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.,* when there is a change in the reporting entity, there is a change in accounting

principles used or to correct an error in previously issued financial statements. Goodyear's restatement was not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatement is an admission by Goodyear that its previously issued financial results and its public statements regarding those results were false.

## DUTIES OF THE AUDIT COMMITTEE MEMBERS

76.     The duties and responsibilities of the Audit Committee, which consisted of five of the eleven sitting Directors on the Goodyear Board at the time that the original Complaint in this action was filed, are set forth in great detail by the Goodyear Audit Committee Charter reproduced below:

MEMBERSHIP

The Audit Committee shall consist of no fewer than three members. The members of the Audit Committee shall be appointed by the Board of Directors and meet the independence and experience requirements of the New York Stock Exchange and applicable law. At least one member of the Audit Committee shall be a financial expert as defined by the Securities and Exchange Commission. Audit Committee members shall not simultaneously serve on the audit committees of more than two other public companies without a determination by the Board of Directors that such service would not impair the ability of such member to effectively serve on the Company's Audit Committee. The members of the Audit Committee shall be appointed by the Board.

PURPOSE

The purpose of the Audit Committee is to assist the Board of Directors in the oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent accountants' qualifications and independence, and (iv) the performance of the independent accountants and the internal auditors. The Audit Committee shall also prepare the "Report of the Audit Committee" to be included in the Company's annual proxy statement pursuant to the rules of the Securities and Exchange Commission.

34

In performing its duties, the Committee will maintain effective working relationships with the Board of Directors, management and the internal and external auditors. To effectively perform his or her role, each Committee member will obtain an understanding of the responsibilities of Committee membership as well as the Company's business, operations and risks. The Audit Committee's role is one of oversight, and it is recognized that the Company's management is responsible for preparing the Company's financial statements and that the independent accountants are responsible for auditing those financial statements.

INDEPENDENT ACCOUNTANTS

The Audit Committee has the ultimate authority and responsibility to directly appoint, retain, compensate, oversee, evaluate, recommend the ratification by the shareholders of the appointment of the independent accountants, and, where appropriate, terminate the independent accountants. The Company shall provide appropriate funding, as determined by the Audit Committee, for payment of compensation to the independent accountants. The independent accountants shall report directly to the Audit Committee.

RESPONSIBILITIES

The Committee shall:

1.      Review the annual audit plan and the results thereof of the independent accountants and internal auditors.

2.      Review the Company's annual financial statements and quarterly financial statements in conjunction with management and the inde-pendent accountants, including the Company's disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations. Discuss with the independent accountants matters required to be discussed by Statement of Auditing Standards No. 61, as amended, the Sarbanes-Oxley Act of 2002 and the New York Stock Exchange.

3.      Review with management and the independent accountants any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements.

4.      Review with the independent accountants any audit problems or difficulties and management's response. Matters to be so reviewed may include (i) critical accounting policies and alternative GAAP treatments, (ii) accounting adjustments that were noted or proposed by the independent accountants but were "passed" (as immaterial or otherwise), (iii) communications between the independent accountants and their national office respecting auditing or accounting issues presented by the audit, and (iv) and material written communications to management, including "internal control" letters issued, or

proposed to be issued, by the independent accountants to the Company.

5.  Discuss with management (i) all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

6.  Ensure that the independent accountants provide a formal written statement delineating all relationships between the independent accountants and the Company, consistent with the provisions of Independence Standards Board Standard No.

7.  Discuss with the independent accountants any disclosure made pursuant to Item 6 above that may impact the objectivity and/or independence of the independent accountants and take, or recommend that the Board of Directors take, appropriate action to ensure the independence of the independent accountants.

8.  Obtain and review, at least annually, a report by the independent accountants describing (i) the independent accountants' internal quality-control procedures, (ii) any material issues raised by the most recent internal quality-control review, or peer group review, of the independent accountants, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the independent accountants, and any steps taken to deal with such issues, and (iii) (to assess the independent accountants' independence) all relationships between the independent accountants and the Company.

9.  Review and pre-approve all auditing services and permitted non-audit services (including the fees and terms thereof) to be performed for the Company by the independent accountants, subject to the de minimus exceptions for non-audit services as permitted by applicable law which are approved by the Audit Committee prior to the completion of the audit.

10.  Review earnings press releases and financial information and earnings guidance provided to analysts and rating agencies. The Audit Committee's responsibility to discuss these matters may be done generally (i.e., discussion of the types of information to be disclosed and the type of presentation to be made). The Audit Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

11.  Review policies and guidelines with respect to risk assessment and risk management, including the Company's major financial risk exposures and the

steps management has taken to monitor and control such exposures.

12.     Establish clear hiring policies for employees or former employees of the independent accountants.

13.     Establish and maintain procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

14.     When appropriate, retain and compensate independent legal, accounting or other advisors at its sole discretion. The Company shall provide for appropriate funding, as determined by the Audit Committee, for payment of compensation to any advisors employed by the Audit Committee and for ordinary expenses of the Audit Committee.

15.     Report regularly to the Board of Directors. In so reporting, the Audit Committee shall review with the Board of Directors any issues that arise (i) with respect to the quality or integrity of the Company's financial statements, (ii) the Company's compliance with legal or regulatory requirements, (iii) the performance and independence of the Company's independent accountants and (iv) the performance of the Company's internal audit function. In addition, the Audit Committee shall perform such other responsibilities as may be delegated to it by the Board of Directors from time to time.

DELEGATION

The Audit Committee may delegate authority to one or more of its members when appropriate, including the authority to grant preapprovals of audit and permitted non-audit services, provided that decisions of such members to grant preapprovals shall be presented to the full Audit Committee at its next scheduled meeting.

MEETINGS

Meetings of the Audit Committee shall be held at least four times a year and will be called by the Chairman of the Committee. The Chief Financial Officer, in consultation with the Chairman of the Audit Committee, shall prepare an agenda for each meeting. In addition to the members of the Audit Committee and the independent accountants, the following Company officials shall attend each meeting: the Chairman of the Board and Chief Executive Officer, the Chief Financial Officer, the Principal Accounting Officer, the Director of Internal Audit and the General Counsel. Other officials may attend when invited by the Committee. The Audit Committee shall also conduct periodic private and separate meetings with each of management, the independent accountants and the

senior internal audit executive.

The Audit Committee will meet with the independent accountants and the Chief Financial Officer, the Principal Accounting Officer and the General Counsel, or their designees, either by telephone or in person, to discuss the annual or quarterly, as the case may be, financial statements prior to their release. The Audit Committee may act by a majority of its members at a meeting or by unanimous written consent.

EVALUATIONS

The Audit Committee shall conduct an annual performance evaluation of its ability to effectively discharge its duties and responsibilities. The Audit Committee shall review at least annually the adequacy of this charter and recommend and propose changes to the Board of Directors for approval.

## THE COMPANY IS ALREADY DAMAGED

77.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No.

1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1,150);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, *¶158-59);*

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶195, 97).

78.     Further, the undisclosed adverse information concealed by the Individual Defendants during Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.  The Company subsequently admitted that its restatement was due to weaknesses in the Company's internal controls. However, during the Relevant Period, the Company never reported that it was operating with deficient internal controls, despite the fact that a material weakness in internal controls is a reportable condition.

79.     As a result of the Individual Defendants actions, Goodyear's market capitalization has been reduced by over $10 billion.

80.     On October 23, 2003, *Reuters News Service* reported a news story entitled "Goodyear restatement seen hurting credibility." The story stated in relevant part:

> Goodyear Tire & Rubber Co., which said it would restate years of financial results, has damaged its credibility and may have put at risk a key part of a contract with its biggest union, analysts said on Thursday.
>
> In a surprise announcement late Wednesday, the nation's largest tiremaker said it overstated results by as much as $100 million from 1998 through the second quarter of 2003.
>
> Goodyear, whose shares tumbled as much as 11 percent on Thursday, already has been struggling with huge losses and marketing problems.

"***One of the most serious implications of (the)...announcement is the blow it deals to Goodyear's already fragile credibility with investors***" wrote Merrill Lynch analyst Jacqueline Weiss in a research note.

Most importantly, it could hurt the company's ability to sell $325 million of debt and equity by year end, analysts warned. That is required as part of a new contract with its largest union, the United Steelworkers of America (News Websites).

"We believe (the) ... announcement will delay such an offering and will make it far more difficult for the company to accomplish one by the end of 2003," added Weiss, who has a "neutral" rating on the company.

A spokesman for Goodyear, which has lost $1.3 billion in the past two years, declined to comment specifically on a debt or equity sale but said it intends to meet the requirements of its contract.

The union agreement calls for the company to sell $250 million of debt plus *$75* million of equity, or a security that is linked to both debt and equity, by Dec. 31.

If the Goodyear doesn't meet that requirement, the Steelworkers would have the right to strike. The union couldn't be reached for comment.

Scott Lee, a debt analyst with Fitch Ratings (News) Inc., agreed that selling any debt or equity will be more difficult as a result.

"In this environment of heightened scrutiny of accounting numbers, it's just bad," he said. "It does nothing to help the believability of their story...When they turn around and have to sell their story to people in the credit markets, I think you'll have a lot of deaf ears."

\* \* \*

Merrill Lynch's Weiss increased her loss estimate to 34 cents from 9 cents.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

81.    Plaintiffs bring this action derivatively in the right and for the benefit of Goodyear to redress injuries suffered, and to be suffered, by Goodyear as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Goodyear is

named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

82.     Plaintiffs will adequately and fairly represent the interests of Goodyear in enforcing and prosecuting its rights.

83.     Plaintiffs were owners of the stock of Goodyear during times relevant to the Individual Defendants' illegal and wrongful course of conduct alleged herein, and remain shareholders of the Company.

84.     As a result of the preceding and subsequent facts set forth in this Complaint, incorporated by reference as if set forth fully herein, and additionally pursuant to Ohio state law, demand on the Goodyear Board to institute this action against themselves and certain officers and directors of Goodyear is not necessary because such a demand would be a futile and useless act.  Not only would this require them to investigate claims against themselves for their own misconduct, but their actions to date prove conclusively that they will not take action.  For the following reasons, demand upon the Board is futile.

85.     The Board of Goodyear at the time of the filing of the Verified Derivative Complaint consisted of the following eleven individuals: defendants Gibara, Keegan, Minter, Pytte, Breen, Hudson, Boland, Zimmerman, Fogarty, Arnold and Forsee (the "Current Director                 Plaintiffs have not made any demand on the present Board of Goodyear to institute this action because such a demand would be a futile, wasteful and useless act.

86.     As set forth in detail below, demand is excused as to all directors or, at the very least, a majority of the Current Director Defendants. Goodyear's Board is saddled with stagnant, ineffective members who have perpetuated the wrongful conduct which has caused significant damage to Goodyear's financial condition and its business reputation.  This Consolidated

Complaint alleges with particularity that all of the Current Director Defendants (comprising the entire Goodyear Board when this action was filed) participated in, encouraged, sponsored or approved many of the acts and omissions or were on notice of and/or intentionally, recklessly, or in the absence of good faith disregarded the wrongdoing complained of herein.  Each Current Director Defendant directed or permitted Goodyear to engage in the wrongful acts complained of herein and to cover up their mismanagement of Goodyear's affairs in connection with the Company's accounting which were known to the Current Director Defendants at all times relevant to the allegations raised herein.  None of these illicit acts are capable of ratification by the Board.  Consequently, each director has been implicated in direct, active misconduct causing harm to Goodyear.  By actively participating in, blatantly ignoring, or failing to disclose the alleged wrongdoing, the Current Director Defendants have not only breached their fiduciary duties to the Company's shareholders, but they have subjected Goodyear to millions of dollars in liability for possible violations of applicable securities laws.  As all members of the Board are implicated in the wrongdoing alleged herein, it is impossible for them to independently consider any action on behalf of the Company against themselves.  In order to bring this suit, the directors of Goodyear would be forced to sue not only themselves, and thus endanger their own vested interests in maintaining their positions with the Company, but also persons with whom they have extensive business, professional and personal entanglements, which they will not do.  Thus, the Goodyear Board have debilitating conflicts of interest that prevent the Board from exercising independent objective judgment in deciding whether to commence this action and vigorously prosecute it to conclusion.  Therefore, for these reasons and those specifically detailed below, demand upon the Board would be a futile act:

**(a)**    **All Current Director Defendants Participated in the Wrongdoing**

87.    The members of the Audit Committee, Nominating and Board Governance Committee, Committee on Corporate Responsibility and Executive Committee all had a responsibility to maintain the integrity of Goodyear's business practices and the fiduciary activities of the Board.  The wrongful activities alleged herein, occurred, in whole or in part, because the Company's internal and supervisory controls were wholly inadequate.  The members of the standing committees of the Board knew that the supervisory and monitoring controls for the Company were inadequate, that there were no internal controls and they thereby knowingly or recklessly permitted the alleged misconduct to take place; in other words, they knew of the misconduct described herein, permitted it to occur and deliberately looked the other way. Because all Current Director Defendants are members of the standing committees of the Board, which are alleged herein to have committed the alleged wrongs and breached their fiduciary duties, demand is excused on this basis alone.

88.    **Audit Committee.**  The Current Director Defendants members of the Audit Committee (defendants Boland [chairman], Breen, Fogarty, Forsee and Hudson, according to Goodyear's proxy filings with the SEC) specifically participated in the wrongs alleged herein and breached their fiduciary duties.  The Audit Committee is responsible for reviewing the activities of Goodyear's internal auditors and independent accountants. The Audit Committee evaluates Goodyear's organization and its internal controls, policies, procedures and practices to determine whether they are reasonably designed to: provide for the safekeeping of Goodyear's assets; assure the accuracy and adequacy of Goodyear's records and financial statements; reviews Goodyear's financial statements and reports; monitors compliance with Goodyear's internal controls, policies, procedures and practices; and receives direct compliance reports from

44

Goodyear's internal auditors and General Counsel and from the independent accountants. Nonetheless, the Audit Committee recommended that the Board include the improper audited consolidated financial statements in Goodyear's Annual Report on Form 10-K for the years ended December 31, 1998-2002, as filed with the SEC.  Defendants' wrongful conduct includes, but is not limited to: causing the Company to violate GAAP; causing the Company to issue false and misleading financial statements; causing the Company to violate its own Audit Charter; and by failing to make any effort to establish and maintain adequate internal accounting controls for Goodyear to ensure the Company's financial results were calculated and recorded in accordance with GAAP.  The Audit Committee violated their own charter by failing to hold the requisite number of meetings during certain fiscal years within the relevant time period, including 2001 (met three times), 2000 (met three times) and 1998 (met three times).  Nevertheless, the Audit Committee managed to meet and evaluate the integrity of the Company's financial statements and their compliance with legal and regulatory requirements a total of *28 times* between 1998 and 2003 alone—yet the accounting errors which led to the Company restating its financials went undiscovered.  Thus, because the defendant members of the Audit Committee are defendants alleged to have participated in the wrongs alleged herein, demand is excused as to these defendants.

89.  **Nominating and Board Governance Committee.**  The Current Director Defendants members of the Nominating and Board Governance Committee (defendants Zimmerman [chairman], Arnold, Fogerty, Minter and Pytte, according to Goodyear's proxy filings with the SEC) specifically participated in the wrongs alleged herein and breached their fiduciary duties. The Nominating and Board Governance Committee members are responsible for reviewing the overall effectiveness of the Board in governing the business practices of

Goodyear.  The members of this committee breached their oversight responsibilities by allowing various directors to maintain their positions of corporate governance in spite of their violations of their fiduciary duties by causing the Company to implement business and financial plans that they knew were based on materially inaccurate accounting statements.  Thus, because the Defendant members of the Nominating and Board Governance Committee are Defendants alleged to have participated in the wrongs alleged herein, demand is excused as to these Defendants.

90. **Committee on Corporate Responsibility.**  The Current Director Defendants members of the Committee on Corporate Responsibility (defendants Minter [chairman], Arnold, Fogerty, Forsee and Pytte, according to Goodyear's proxy filings with the SEC) specifically participated in the wrongs alleged herein and breached their fiduciary duties. The members of the Committee on Corporate Responsibility are responsible for reviewing Goodyear's legal compliance programs and monitoring its business conduct policies and practices, as well as the Company's relationships with shareholders, employees, customers, governmental agencies, and the general public.  The members of this committee severely breached their oversight responsibilities by participating in, approving, and/or permitting: violations of  fiduciary duties owed by the Board to the Goodyear and its shareholders;  the dissemination of false and/or misleading financial statements to the SEC, its shareholders, and the investing public; and wrongdoing on behalf of the Board which may expose Goodyear to potential civil and criminal liability.  Thus, because the defendant members of the Committee on Corporate Responsibility are defendants alleged to have participated in the wrongs alleged herein, demand is excused as to these defendants.

91.     **Executive Committee.**   The Current Director Defendants members of the Executive Committee (defendants Gibara [chairman], Breen, Boland, Hudson, Minter and Zimmerman, according to Goodyear's proxy filings with the SEC) specifically participated in the wrongs alleged herein and breached their fiduciary duties.   The Executive Committee is comprised of the chairpersons from each of the standing committees in Goodyear's Board and the Chairman of the Board.  The Executive Committee members are responsible for reviewing management's implementation of Goodyear's financial and business plans, strategies, and operations. The members of this committee breached their oversight responsibilities by allowing the Company to implement business and financial plans that they knew were based on materially inaccurate accounting statements.   This all occurred, despite the fact that the Executive Committee consists of the chairpersons from the Audit Committee, Board Governance Committee and the Committee on Corporate Responsibility, all of which were responsible for ensuring that Goodyear comply with proper business practices.  Thus, because the defendant members of the Executive Committee are defendants alleged to have participated in the wrongs alleged herein, demand is excused as to these defendants.

(**b**)          **Defendant Gibara Personally Benefited from the Wrongs Alleged**

92.     Defendant Gibara knew the adverse non-public information regarding the improper accounting as a result of: his access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings.  Defendant Gibara not only knew about this undisclosed adverse information, but he was personally and directly involved in the misconduct alleged and approved the actions complained of.

93.     While in possession of this material adverse non-public information regarding the Company, defendant Gibara engaged in massive insider selling during the Relevant Period, dumping 7,200 shares of his personally-held Company stock for proceeds of $449,382.

94.     Defendant Gibara cannot be relied upon to reach a truly independent and disinterested decision as to whether to accept plaintiffs' demands.  He is interested in this lawsuit as a result of his insider trading conducted during the relevant period.  Furthermore, defendant Gibara would never institute a suit against his fellow directors, because it would shed light on his illicit activities and invite scrutiny to his own stock sales.  Because defendant Gibara received a personal financial benefit from the challenged insider trading transactions, he has a personal interest at stake in the outcome of this litigation, and any demand upon him is futile.

**(c)     All Current Director Defendants Failed to Fully Inform Themselves to the Extent Reasonably Appropriate under the Circumstances**

95.     The Current Director Defendants failed to place sufficient controls and procedures in place to prevent harm to the Company.  They allowed the accounting irregularities and rampant corporate malfeasance to continue for a period of five years, eventually forcing Goodyear to restate its financials twice in a six-month period.  The Current Director Defendants, and especially those members of the Audit Committee, Nominating and Board Governance Committee, Committee on Corporate Responsibility, Executive Committee and Finance Committee, failed in significant measure to fully inform themselves of the affairs of Goodyear, failed to adequately involve themselves in decision-making and failed to establish adequate internal controls over management and the affairs of Goodyear particularly with respect to the Company's financial statements and reporting process.

96.     The sustained and systematic failure of the Current Director Defendants to exercise oversight and to reasonably inform themselves to the extent reasonable under the

circumstances, especially given that the failure involves a scheme of such significant magnitude and duration which went undiscovered by the Board, demonstrates that any demand here is futile.

**(d)      The Current Director Defendants Are Not Protected by the Business Judgment Rule**

97.      During the Relevant Period, the Current Director Defendants caused the Company to issue numerous false and misleading financial statements in violation of GAAP.  The fact that Goodyear restated its financial statements for fiscal 1998 through 2003 is an admission that the financial statements originally issued were false when issued and that the overstatement of revenues and income was material.

98.      Because the dissemination of false and misleading financial statements can never be deemed to be the product of a valid exercise of business judgment, demand is excused as the Board.

99.      Furthermore, the Current Director Defendants' knowing participation in, conspiracy, and/or aiding and abetting of the unlawful activities alleged herein were not—and could never be—the product of a valid exercise of business judgment. Such wrongful conduct on behalf of the Board includes: failure to instigate an action against themselves or other present or former employees of Goodyear who were responsible for exposing the Company to significant losses due to the Company's illicit scheme to hide the true financial and operational condition of the business in order to support the value of the stock; an obvious and prolonged failure to exercise oversight or supervision; various breaches of fiduciary duties owed by each Board member, which are incapable of ratification; causing Goodyear to violate the law and exposing it to significant liability, acts which are incapable of ratification; and wasting Goodyear's corporate assets, an act incapable of ratification.

**(e)**　　　**The Current Director Defendants are Neither Independent nor Disinterested**

100.　　The Current Director Defendants cannot be relief upon to reach a truly independent decision as to whether to commence the demanded legal actions against themselves and the officers, employees and/or consultants responsible for the misconduct alleged in this Consolidated Complaint because, inter alia, the entire Board was totally dominated by defendants who were personally and directly involved in the misconduct alleged, each of whom approved all of the actions complained of, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board by these defendants has impaired its ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether or not to accept plaintiffs' demands.

101.　　In order to bring this action for breach of their fiduciary duties, the members of Goodyear's Board would be required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do. Therefore, the Current Director Defendants would not be able to vigorously prosecute any such action.

102.　　The members of Goodyear's Board receive payments, benefits and other emoluments such as vested stock option rights by virtue of their Board membership and their control of Goodyear. Thus, they have benefited from the wrongdoing alleged herein and have engaged in such conduct in order to preserve their positions of control and the prerequisites thereof, and are, therefore, incapable of exercising independent objective judgment in deciding whether or not to bring this action.

103.　　Any suit by the current directors of Goodyear to remedy these wrongs would likely expose the Individual Defendants and Goodyear to further violations of the securities laws

50

that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves. If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile.

104.     By failing to instigate any action against their fellow directors, officers, or employees in the face of mounting liability for Goodyear, the Current Director Defendants have already confirmed their unwillingness to prosecute these claims.  Goodyear has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Goodyear any part of the damages the Company suffered and will suffer thereby.  Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiffs, the current Board has failed and refused to seek to recover for Goodyear for any of the wrongdoing alleged by plaintiffs herein.

105.     All of the Current Director Defendants (or at the very least, a majority of the Board) are subject to the following prejudicial entanglements which illustrate how the Individual Defendants are neither disinterested nor independent:

(a)    **Defendant Gibara.**  Gibara is directly interested due to his self-dealing which consisted of large volume insider trading during the Relevant Period (*see* ¶¶88-90, *supra*) and his participation in the wrongs alleged herein, including but not limited to falsely certifying the accuracy of the Company's financial statements. During the Relevant Period, Gibara served as President (until January 1, 2000), CEO (until December 31, 2002) and served as Chairman of the Board until June 30, 2003. Gibara signed the Company's admittedly false Form 10-K Annual Reports for fiscal years 1998 through 2003.  Defendant Gibara would never institute a suit against his fellow directors because it would bring scrutiny to his own stock sales.  In addition, defendant Gibara served on the Board Governance Committee between 1999 and 2001, and served as the Chairman of the Executive Committee, which was comprised of the chairpersons of each of Goodyear's other Board committees (defendants Boland, Breen, Hudson, Minter and Zimmerman), and is responsible for consulting with management and reviewing management's implementation of Goodyear's financial and business plans, strategies, and operations.  As a result of these positions, defendant Gibara knew that the supervisory and monitoring controls for the Company were inadequate, and thereby knowingly or recklessly permitted the alleged misconduct to take place. Gibara also had incentive not to initiate an action which may have impacted the Company's stock price, as he owned the rights to 893,900 worth of Company stock, which may be acquired upon the exercise of options which were exercisable prior to April 29, 2003 under Goodyear's 2002 Performance Plan (the "2002 Plan"), Goodyear's 1997 Performance Incentive Plan (the "1997 Plan") and the 1989 Goodyear Performance and Equity Incentive Plan (the "1989 Plan"). Futhermore, Gibara would never institute a suit against fellow directors Breen, Hudson, Boland, Zimmerman and Forsee, all of whom served on the Compensation Committee and who determined Gibara's salary, bonus, and stock options.  To

sue these individuals would jeopardize his financial stake in the Company.

(b)     **Defendant Keegan.**   Keegan is neither disinterested nor independent because of his close professional relationship with defendant Gibara and his participation in the wrongs alleged herein, including but not limited to falsely certifying the accuracy of the Company's financial statements.   During the Relevant Period, Keegan served as director and currently serves as the President and CEO of Goodyear.   Keegan lacks independence from defendant Gibara.  Defendant Keegan was nominated for the position of director of Goodyear in 2000 by defendant Gibara, who was a member of the Nominating and Board Governance Committee along with defendants Hudson, Minter, Pytte, Schofield, Turner and Walker.  Keegan signed the Company's admittedly false Form 10-K Annual Reports for fiscal years 2002 and 2003.   According to Company statements to the <u>Associated Press</u> on October 1, 2003, after Gibara was replaced as CEO by Keegan, Goodyear stated Gibara would remain chairman and would "closely monitor the transition and will help Keegan with his new responsibilities." Moreover, the principle professional occupation of defendant Keegan is his employment with Goodyear, pursuant to which he receives and continues to receive substantial compensations and other benefits.  Keegan has incentive not to initiate an action which may impact the Company's stock price, as he owns the rights to 187,500 worth of Company stock, which may be acquired upon the exercise of options which are exercisable prior to April 29, 2003 under Goodyear's 2002 Plan, Goodyear's 1997 Plan, and the 1989 Plan.  In 2003, Keegan received $1 million in salary and a $509,200 bonus, compared to $840,000 in salary and no bonus in 2002. Accordingly, defendant Keegan lacks independence from and would never institute a suit against fellow directors Breen, Hudson, Boland, Zimmerman and Forsee, all of whom serve on the Compensation Committee that determines Keegan's salary, bonus, and stock options.  This lack

of independence renders defendant Keegan incapable of impartially considering a demand to commence and vigorously prosecute this action.

(c)     **Defendant Minter.**     Minter is neither disinterested nor independent because of his close professional relationship with fellow Director Defendants and his participation in the wrongs alleged herein.  Throughout the Relevant Period, Minter served as director of the Company, and as a member of the Compensation Committee (along side Director Defendants Pytte, Breen, Hudson [five (5) years], Zimmerman [two (2) years], Forsee and Boland [one (1) year]); the Nominating and Board Governance Committee (along side Director Defendants Pytte [five (5) years], Hudson and Gibara [four (4) years], Fogarty [three (3) years], Zimmerman [two (2) years], Breen and Arnold [one (1) year]); and the Committee on Corporate Responsibility, on which he serves as chairperson (along side Director Defendants Pytte, Fogarty, Hudson, Forsee and Arnold).   Minter also served on the Executive Committee, along side Director Defendants Gibara, Breen, Hudson, Boland and Zimmerman.  Because he served on the Compensation Committee during the Relevant Period, and because he helped determine the salaries, bonuses, and stock option awards for Board members due to this position, defendant Minter would never institute a suit against defendant Gibara, because it would further implicate him in the wrongs complained of herein.  In addition, defendant Minter is beholden to defendants Boland, Breen, Forsee, Hudson, Pytte and Zimmerman, members of the Compensation Committee which singularly controls Minter's personal financial compensation.  To sue these individuals would jeopardize his financial stake in the Company.  Futhermore, defendant Minter is interested because he served on the Board Governance Committee and the Committee on Corporate Responsibility (which he chairs) throughout the Relevant Period, and knew that the Company lacked sufficient supervisory and monitoring controls for ensuring that its business

policies and practices complied with the law, and thereby knowingly or recklessly permitted the alleged misconduct to take place.

(d) **Defendant Pytte.**  Pytte is neither disinterested nor independent because of his close professional relationship with fellow Director Defendants and his participation in the wrongs alleged herein.  Throughout the Relevant Period, Pytte served as director of the Company, and as a member of the Compensation Committees, Nominating and Board Governance Committee, and the Committee on Corporate Responsibility. Because he established salaries, bonuses, and stock option awards for Board members due to his position on the Compensation Committee, defendant Pytte would never institute a suit against defendant Gibara, because it would further implicate him in the wrongs complained of herein.  In addition, defendant Pytte is interested because he served on the Board Governance Committee and the Committee on Corporate Responsibility throughout the Relevant Period, and knew that the Company lacked sufficient supervisory and monitoring controls for ensuring that its business policies and practices complied with the law, and thereby knowingly or recklessly permitted the alleged misconduct to take place.

(e) **Defendant Breen.**  Breen is neither disinterested nor independent because of his close professional relationship with fellow Director Defendants and his participation in the wrongs alleged herein.  Throughout the Relevant Period, Breen has served as director of the Company, and as a member of the Audit Committee, Compensation Committee, and Nominating and Board Governance Committee (one year).  Defendant Breen served on the Executive Committee, along side Director Defendants Gibara, Hudson, Boland and Zimmerman. Because he establishes salaries, bonuses, and stock option awards for Board members due to his position on the Compensation Committee, defendant Breen would never institute a suit against defendant

Gibara, because it would further implicate him in the wrongs complained of herein.  In addition, defendant Breen is interested because he served on the Audit Committee throughout the Relevant Period, and knew or should have known that the Company lacked sufficient supervisory and monitoring controls for ensuring that its business policies and practices complied with generally acceptable principles of accounting and other legal requirements, and thereby knowingly or recklessly permitted the alleged misconduct to take place.

(f)    **Defendant Hudson.**  Hudson is neither disinterested nor independent because of his close professional relationship with fellow Director Defendants and his participation in the wrongs alleged herein.  Throughout the Relevant Period, Hudson has served as director of the Company, and as a member of the Audit Committee, Compensation Committee, the Nominating and Board Governance Committee (four years) and the Committee on Corporate Responsibility (one year).  Defendant Breen also served on the Executive Committee, along side Director Defendants Gibara, Hudson, Boland and Zimmerman.  Because he establishes salaries, bonuses, and stock option awards for Board members due to his position on the Compensation Committee, Defendant Hudson would never institute a suit against defendant Gibara, because it would further implicate him in the wrongs complained of herein.  In addition, defendant Breen is interested because he served on the Audit Committee and the Nominating and Board Governance Committee during the Relevant Period, and knew or should have known that the Company lacked sufficient supervisory and monitoring controls for ensuring that its business policies and practices complied with generally acceptable principles of accounting and other legal requirements, and thereby knowingly or recklessly permitted the alleged misconduct to take place.

(g)      **Defendant Fogarty.**  Fogarty is neither disinterested nor independent because of his close professional relationship with fellow Director Defendants and his participation in the wrongs alleged herein.  During the Relevant Period, Fogarty served as director of the Company, and as a member of the Nominating and Board Governance Committee, the Committee on Corporate Responsibility and the Audit Committee.  Defendant Fogarty was beholden to defendants Gibara, Minter, Pytte and Hudson, who nominated him for the Goodyear Board and to whom he owes his current position with the Company, and defendants Pytte, Breen, Hudson, Boland and Zimmerman, who set his compensation and benefits.  Furthermore, defendant Breen is interested because he served on the Audit Committee, the Nominating and Board Governance Committee and the Committee on Corporate Responsibility at different intervals during the Relevant Period, and knew or should have known that the Company lacked sufficient supervisory and monitoring controls for ensuring that its business policies and practices complied with generally acceptable principles of accounting and other legal requirements, and thereby knowingly or recklessly permitted the alleged misconduct to take place. Defendant Fogarty would never institute a suit against defendants, because it would further implicate him in the wrongs complained of herein.

(h)      **Defendant Zimmerman.**  Zimmerman is neither disinterested nor independent because of his close professional relationship with fellow Director Defendants and his participation in the wrongs alleged herein.  During the Relevant Period to the present day, Zimmerman has served as director of the Company, and as a member of the Compensation Committee, the Finance Committee and the Nominating and Board Governance Committee, on which he serves as chairman.  Defendant Zimmerman is beholden to defendants Gibara, Minter, Pytte and Hudson, who nominated him for the Goodyear Board and to whom he owes his current

position with the Company.  Because he establishes salaries, bonuses, and stock option awards for Board members due to his position on the Compensation Committee, defendant Zimmerman would never institute a suit against defendant Gibara, because it would further implicate him in the wrongs complained of herein.  In addition, defendant Zimmerman is interested because he served on the Executive Committee, and serves on the Nominating and Board Governance Committee, and knew or should have known that the Company lacked sufficient supervisory and monitoring controls for ensuring that its business policies and practices complied with generally acceptable principles of accounting and other legal requirements, and thereby knowingly or recklessly permitted the alleged misconduct to take place. Defendant Zimmerman would never institute a suit against defendants, because it would further implicate him in the wrongs complained of herein.

(i)      **Defendant Boland.**  Boland is neither disinterested nor independent because of his close professional relationship with fellow Director Defendants and his participation in the wrongs alleged herein.  During the Relevant Period to the present day, Boland has served as director of the Company, and as a member of the Compensation Committee, the Executive Committee, the Finance Committee and the Audit Committee, on which he serves as chairman. Defendant Boland is beholden to defendants Gibara, Minter, Pytte, Hudson and Fogarty, who nominated him for the Goodyear Board and to whom he owes his current position with the Company.  Because he establishes salaries, bonuses, and stock option awards for Board members due to his position on the Compensation Committee, defendant Boland would never institute a suit against defendant Gibara, because it would further implicate him in the wrongs complained of herein.  In addition, defendant Boland is interested because he served on the Executive Committee, and as chairman of the Audit Committee, and knew or should have known that the

58

Company lacked sufficient supervisory and monitoring controls for ensuring that its business policies and practices complied with generally acceptable principles of accounting and other legal requirements, and thereby knowingly or recklessly permitted the alleged misconduct to take place. Defendant Boland would never institute a suit against Defendants, because it would further implicate him in the wrongs complained of herein.

(j)     **Defendant Forsee.**  Forsee is neither disinterested nor independent because of his close professional relationship with fellow Director Defendants and his participation in the wrongs alleged herein.  During the Relevant Period to the present day, Forsee has served as director of the Company, and as a member of the Compensation Committee, the Audit Committee and the Committee on Corporate Responsibility.  Defendant Forsee is beholden to defendants Gibara, Minter, Pytte, Hudson and Fogarty, who nominated him for the Goodyear Board and to whom he owes his current position with the Company.  Because he establishes salaries, bonuses, and stock option awards for Board members due to his position on the Compensation Committee, defendant Forsee would never institute a suit against defendant Gibara, because it would further implicate him in the wrongs complained of herein.  In addition, defendant Forsee is interested because he serves on the Audit Committee and the Committee for Corporate Responsibility, and knew or should have known that the Company lacked sufficient supervisory and monitoring controls for ensuring that its business policies and practices complied with generally acceptable principles of accounting and other legal requirements, and thereby knowingly or recklessly permitted the alleged misconduct to take place. Defendant Forsee would never institute a suit against defendants, because it would further implicate him in the wrongs complained of herein.

59

(k)    **Defendant Arnold.**  Arnold is neither disinterested nor independent because of his close professional relationship with fellow Director Defendants and his participation in the wrongs alleged herein.  During the Relevant Period to the present day, Arnold has served as director of the Company, and as a member of the Nominating and Board Governance Committee, Finance Committee and the Committee on Corporate Responsibility.  Defendant Arnold is beholden to defendants Minter, Pytte, Hudson, Fogarty and Zimmerman, who nominated him for the Goodyear Board and to whom he owes his current position with the Company.  In addition, defendant Arnold is beholden to Defendants Boland, Breen, Forsee, Hudson, Pytte and Zimmerman, members of the Compensation Committee which singularly controls Arnold's personal financial compensation.  To sue these individuals would jeopardize his financial stake in the Company.  Furthermore, defendant Arnold is interested because he serves on the Committee for Corporate Responsibility, and knew or should have known that the Company lacked sufficient supervisory and monitoring controls for ensuring that its business policies and practices complied with generally acceptable principles of accounting and other legal requirements, and thereby knowingly or recklessly permitted the alleged misconduct to take place. Defendant Arnold would never institute a suit against defendants, because it would further implicate him in the wrongs complained of herein.

**(f)    Insured Verses Insured Exclusion**

106.    Upon information and belief, Goodyear's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by very substantial directors' and officers' liability insurance, which they caused the Company to purchase for their protection out of corporate funds (*i.e.,* monies belonging to the stockholders of Goodyear).

60

107.    Upon information and belief, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, however, applicable liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for **any** action brought directly by Goodyear against these defendants; such provisions are known as, *inter alia,* the "***insured versus insured exclusion***."

108.    As a result, if these directors were to sue themselves or certain of the officers of Goodyear, there would be no directors' and officers' insurance protection. If there is no directors' and officers' liability insurance at all then the current directors will not cause Goodyear to sue them, since they will face a large uninsured liability.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery for the multi-million dollar damages it has sustained.

109.    Plaintiffs have not made any demand on shareholders of Goodyear to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Goodyear is a publicly held company with approximately 175 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against Defendants Gibara, Keegan and Tieken for
### Violations of Sarbanes-Oxley Act of 2002

110.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

111.    Pursuant to the Sarbanes-Oxley Act of 2002 §304, because Goodyear will be required to prepare an accounting restatement for fiscal years 1998-2002 due to material noncompliance with GAAP; as a result of the false and misleading financial statements caused to be issued by the Company; and their own misconduct during the Relevant Period, defendants Gibara and Keegan, as Goodyear's CEO, and defendant Tieken, as Goodyear's CFO, are required to reimburse Goodyear for all bonuses or other incentive-based or equity-based compensation, received by them from Goodyear from 1998-2002, as identified herein.

112.    Defendants Gibara, Keegan and Tieken are also liable to plaintiffs or reasonable costs and attorneys' fee in the prosecution of this derivative action on behalf of Goodyear.

## COUNT II

### Against the Insider Selling Defendant for Breach of Fiduciary
### Duties for Insider Selling and Misappropriation of Information

113.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

114.    At the time of the stock sales set forth herein, the Insider Selling Defendant knew the information described above, and sold Goodyear common stock on the basis of such information.

115.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary

asset belonging to the Company, which the Insider Selling Defendant used for his own benefit when he sold Goodyear common stock.

116.    At the time of his stock sales, the Insider Selling Defendant knew that the Company's revenues were materially overstated. The Insider Selling Defendant's sales of Goodyear common stock while in possession and control of this material adverse non-public information was a breach of his fiduciary duties of loyalty and good faith.

117.    Since the use of the Company's proprietary information for his own gain constitutes a breach of the Insider Selling Defendant's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendant obtained thereby.

**COUNT III**

**Against All Defendants for Breach of Fiduciary Duty**

118.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

119.    The Individual Defendants owed and owe Goodyear fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Goodyear the highest obligation of good faith, fair dealing, loyalty and due care.

120.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

121.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote

the Company's corporate interests.

122.    As a direct and proximate result of the Individual Defendants failure to perform their fiduciary obligations, Goodyear has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

123.    Plaintiffs on behalf of Goodyear have no adequate remedy at law.

## COUNT IV

### Against All Defendants for Abuse of Control

124.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

125.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Goodyear, for which they are legally responsible.

126.    As a direct and proximate result of the Individual Defendants' abuse of control, Goodyear has sustained significant damages.

127.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

128.    Plaintiffs on behalf of Goodyear have no adequate remedy at law.

## COUNT V

### Against All Defendants for Gross Mismanagement

129.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though filly set forth herein.

130.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Goodyear in a manner consistent

with the operations of a publicly held corporation.

131.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Goodyear has sustained significant damages in excess of hundreds of millions of dollars.

132.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

133.    Plaintiffs on behalf of Goodyear have no adequate remedy at law.

## COUNT VI

### Against All Defendants for Waste of Corporate Assets

134.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

135.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Goodyear to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions/billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

136.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

137.    Plaintiff on behalf of Goodyear have no adequate remedy at law.

## COUNT VII

### Against All Defendants for Unjust Enrichment

138.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though frilly set forth herein.

139.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Goodyear.

140.    Plaintiffs, as shareholders and representatives of Goodyear, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Declaring that defendants Gibara, Keegan and Tieken are liable under the Sarbanes-Oxley Act of 2002 and requiring them to reimburse Goodyear for all bonuses or other incentive-based or equity based compensation received by them between 1998-2002.

C.    Extraordinary equitable and/or injunctive relief as permitted bylaw, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Goodyear have an effective remedy;

D.    Awarding to Goodyear restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

E.    Awarding to plaintiffs the costs and disbursements of the action, including

reasonable attorneys' fees, accountants and experts' fees, costs, and expenses; and

     F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

     Plaintiff demands a trial by jury.

DATED: June 28, 2004               SCANLON & GEARJNGER

JOHN SCANLON (Sup. Ct. #0064l69)
106 S. Main Street, Ste. 1100
Akron, OH 4.4308
Telephone:     330/376-4558
Facsimile:     330/376-3550
johns@s-glaw.com

*Court-Appointed Liason Counsel for*
*Derivative Plaintiffs*

J. DEWEY BRANSTETTER, JR.
JAMES G. STRANCH
JOE P. LENISKI, JR.
BRANSTETTER, KILGORE, STRANCH
   & JENNINGS
227 Second Avenue North
Nashville, TN 37201
Telephone:     615/254-8801
Facsimile:     615/255-5419

*Court-Appointed Lead Counsel*
*for Derivative Plantiffs*

## VERIFICATION

Billy G. Borchert, certifies under penalty of perjury that (1) he is the chairman of the Plumbers and Pipefitters Local 572 Pension Fund, (2) the Fund has authorized the filing of this suit, (3) he has reviewed the Consolidated Complaint against the current and former Board of Directors and certain officers of The Goodyear Tire & Rubber Company, and (4) that the foregoing is true to the best of his knowledge, information, and belief.

Dated: June 28, 2004

PLUMBERS & PIPEFITTERS LOCAL
572 PENSIONS FUND

By:_____
       BILLY G. BORCHERT

Its: _____

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 28, 2004, a copy of the foregoing Consolidated Complaint was filed electronically.  Notice of this filing will be sent to all parties either by U.S. Mail or by operation of the court's electronic filing system. Parties may access this filing through the Court's system.

s/John T. Scanlon_____
JOHN T. SCANLON

68